IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| ROBERT MAUK,<br><br>Plaintiff,<br><br>vs.<br><br>JOANNE B. BARNHART,<br>Commissioner of Social Security<br>Defendant. | No.  CIV 05-398-TUC-CKJ (BPV)<br><br>**REPORT AND<br>RECOMMENDATION** |

Plaintiff filed this action for review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). This Social Security Appeal has been referred to the Unites States Magistrate Judge pursuant to the Rules of Practice of this Court.

Plaintiff's "Motion for Summary Judgment" (Document #7), Defendant's "Cross-Motion and Memorandum in Support of Defendant's Motion Remand and in Opposition to Plaintiff's Motion for Summary Judgment" (Document #12), and Plaintiff's "Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment and to Defendant's Cross-Motion to Remand" (Document #19), are before the Court. For the following reasons, the Magistrate Judge recommends that the ALJ's decision be reversed and the matter be remanded for an immediate award of benefits.

I.    **PROCEDURAL HISTORY**

The Plaintiff, Robert Mauk, filed an application for Social Security Disability Insurance Benefits and Supplemental Security Income Benefits on February 20, 1996. (93)[1] Plaintiff alleged a disability onset date of May 16, 1991. (Id.)  Plaintiff stated that his disabling condition was "sharp pain in neck and lower back. Can't grip or hold onto things. Constantly dropping things." (123)  This claim was denied, initially, (75, 77-80), and on reconsideration (66, 82-85).  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (86)  ALJ Norman Buls held a hearing on February 5, 1997, and Plaintiff, who was represented by counsel, testified at the hearing. (367-398)  Additionally, Exhibits 1A-2A, 1B to 7B, 1D to 3D, 1E to 9E, and 1F to 6F were admitted at the hearing. (371)  On March 17, 1997, the record was reopened and Exhibits 7F -10F were entered into the record. (399)

On May 17, 1997, the ALJ issued a decision finding that Plaintiff was not disabled. (282-91)  The ALJ found that the evidence confirmed the following medically determinable impairments: severe status post 1991 work injury with musculoligamentous strains of the cervical dorsal spine and lumbosacral spine and carpal tunnel syndrome bilaterally. (286, 289)  The ALJ further found that these impairments did not meet the criteria of listed impairments in Appendix 1 to Part 404, 20 C.F.R. Chapter III. (Id.)  The ALJ found the Plaintiff's testimony as to his subjective symptoms to be not credible to the degree alleged. (288) The ALJ found the claimant had the residual functional capacity to perform light work on a sustained basis, with no repetitive lifting but could not return to his past relevant work as a drill operator or roofer. (289-290)  The ALJ found that strict application of the Medical-Vocational Rules in Appendix 2 to Part 404, 20 CFR Chapter III (the "Grid") was warranted, and, the Grid directed a conclusion of not disabled. (Id.)

---

[1]All numbers in parentheses are references to the pages as numbered in the Transcript of the Record, except where indicated otherwise.

1    Plaintiff requested review of the ALJ's decision, arguing that the ALJ erred by

2    ignoring the opinions of the Plaintiff's attending physician. (296-299)  The Appeals Council

3    granted review, vacated the hearing decision, and remanded the case to the Administrate Law

4    Judge on November 9, 1998. (300-303)  The Appeals Council found that the ALJ's decision

5    contained no rationale for the assessed residual functional capacity. (301)

6    ALJ Norman Buls held a second hearing on March 10, 1999, and Plaintiff, again

7    represented by counsel, testified at the hearing. (39)  Exhibits 1A-3A, 1B to 10B, 1D to 3D,

8    1E to 9E, and 1F to 12F were admitted at the hearing. (41)  On June 10, 1999, the record was

9    reopened and Exhibits 13F-14F were entered into the record. (73-74)

10    On September 18, 1999, the ALJ issued a decision finding that Plaintiff was not

11    disabled. (11-28)  The ALJ found that the evidence confirmed the following medically

12    determinable impairments: bilateral carpal tunnel syndrome, status post operative release on

13    the right; status post ligamentous strains of the cervical-dorsal and lumbosacral spine

14    segments; and an affective disorder. (17, 27)  The ALJ further found that these impairments

15    did not meet the criteria of listed impairments in Appendix 1 to Part 404, 20 C.F.R. Chapter

16    III. (Id.)  The ALJ found the Plaintiff's testimony as to the nature and degree as well as the

17    onset date of his subjective symptoms to be not credible to the degree alleged. (25,27)

18    The ALJ found the claimant had the residual functional capacity to perform light work

19    on a sustained basis, except as limited by the inability to handle, finger, or perform repetitive

20    movements with the hands, as well as psychological non-exertional limitations consisting of

21    slight restriction in daily living activities and moderate difficulties in maintaining social

22    functioning. (26, 27)  The ALJ found that strict application of the Medical-Vocational Rules

23    in Appendix 2 to Part 404, 20 CFR Chapter III (the "Grid") was not warranted, but that they

24    remained useful as a guideline and tended to support the conclusion that the Plaintiff was not

25    disabled. (Id.)

26    The ALJ found that the Plaintiff's capacity for a full range of light work was not

27    significantly comprised by his additional limitations, and, accordingly, Plaintiff was not

28    prevented from engaging in alternative substantial gainful employment.    (26, 28)

1    Accordingly, the ALJ found that the Plaintiff was not under a "disability" as defined by the

2    SSA at any time through the date of the ALJ's decision.  (26, 28)

3         Plaintiff requested review of the ALJ's decision and submitted additional arguments

4    in support of his contentions.  (10, 364-366)  The Appeals Council denied the request for

5    review.  (7)

6         Plaintiff filed an action in District Court appealing the denial of benefits.  (245)

7    Following a delay due to a remand in order to locate or reconstruct the file, the parties

8    stipulated to a remand before a different ALJ to obtain a consultative mental status

9    examination with a medical source statement and medical expert testimony and also

10   supplemental testimony from a vocational expert. (472)

11        Thereafter, the Appeals Council vacated the final decision of the Commissioner and

12   remanded the case to an ALJ for further proceedings.  (475)  At Plaintiff's insistence, the

13   hearing was dismissed, but later reinstated when Plaintiff's attorney indicated that Plaintiff

14   wished to continue with the proceedings.  (469,511)  Plaintiff requested that the Appeals

15   council review the dismissal and reinstate the hearing because he had dismissed the case

16   because he was discouraged.  (478-80)  The Appeals Council granted the Plaintiff's request

17   and remanded the case for further proceedings, including a hearing before an ALJ.  ( 486-87)

18        ALJ Lauren Mathon held a third hearing on August 30, 2004, and Plaintiff, without

19   representation, testified at the hearing.  (430)  A security guard was present at the hearing.

20    (430)   Additionally, Exhibits 5A, 18B to 28B, 4D to 5D, 16F to 20F were admitted at the

21   hearing.  (433)

22        On April 8, 2005, the ALJ issued a decision finding that Plaintiff was not disabled.

23   (403-19)  The ALJ found that the evidence confirmed the following "severe" medically

24   determinable impairments: bilateral carpal tunnel syndrome, status post operative release on

25   the right; status post ligamentous strains of the cervical and lumbosacral spine; and major

26   depressive disorder.  (404,415.)  The ALJ further found that these impairments did not meet

27   the criteria of listed impairments in Appendix 1 to Part 404, 20 C.F.R. Chapter III. (Id.) The

28   ALJ found that the plaintiff did have a medically determinable impairment which could

1   reasonably be expected to produce the claimant's subjective symptoms, but did not find the

2   Plaintiff's allegations of symptoms fully credible. (410-11,415)  The ALJ found the claimant

3   had the residual functional capacity to perform light work. (414-15)  The ALJ found that

4   plaintiff was limited in this capacity however, by his ability to handle, finger , or perform

5   repetitive movements with the hands, and further, that he would work best in an environment

6   with superficial, brief contact with the public. (414-15)  The ALJ found no other exertional

7   or non-exertional limitations.  (414)

8       The ALJ found that the hypothetical questions asked of the vocational expert during

9   the March 1999 hearing accurately described an individual of the Plaintiff's background and

10  functional limitations, and that the vocational expert identified jobs that the Plaintiff could

11  perform within his residual functional capacity.  (414-15)

12      Furthermore, the ALJ found that application of 20 CFR 404.1569 and 416.969, and

13  20 CFR 404 Subpart P, Appendix 2, Rule 202.21, Table No.2, would direct a conclusion that

14  the Plaintiff was not disabled, and that the Plaintiffs capacity for the full range of light work

15  had not been significantly reduced by his non-exertional impairments.  (415)

16      Accordingly, the ALJ found that the Plaintiff was not under a "disability" as defined

17  by the SSA.  (415-16)

18      Plaintiff did not request review of the ALJ's decision however, after retaining counsel,

19  filed this action in federal court seeking judicial review pursuant to 42 U.S.C. §§405(g) and

20  1383(c)(3).

21      Plaintiff moves for summary judgment, arguing that the ALJ's decision was not

22  supported by substantial evidence and that the ALJ erred in discounting the opinions of the

23  treating and examining psychologists, relying on vocational testimony from a prior hearing,

24  and finding Plaintiff not disabled based on the Medical-Vocational Guidelines.

25      Defendant responds in opposition, asserting that the motion for summary judgment

26  should be denied, and that the case should be remanded to remedy defects in the

27  administrative proceeding.

28

## II.    THE COMMISSIONER'S DECISION AND EVIDENCE PRESENTED

ALJ Norman Buls held hearings on February 5, 1997 and March 10, 1999.  (367-399,39-74)    Plaintiff, who was represented by counsel, testified at both hearings. Additionally, Ruth Van Vleet, a vocational expert, testified at the second hearing.  (TR 40.) ALJ Lauren Mathon held a third hearing on August 30, 2004, at which Plaintiff appeared unrepresented.  (428-466)

## A.    Plaintiff's Testimony - First Hearing

Plaintiff was born November 14, 1956; reached the eleventh grade in school, and thereafter obtained a GED.  (374-75)  Plaintiff resided in his truck on a friend's property. (376) Plaintiff last worked in May, 1991, in a machine shop.  (377-78)  He quit work one week after he injured himself on the job.  (378)  His job required stretching and lifting approximately 40 pound parts onto a revolving drill table.  (Id.)  Plaintiff acknowledged that when he had a residence, he worked in his garden and would tinker around with wood.  (378)

Plaintiff testified that he believed that the maximum weight he felt he could lift would be twenty or twenty-five pounds.  (381)  Plaintiff testified that he gets "hot neck pain" and sees black and white dots and gets frequent headaches.  (381)  Plaintiff also has trouble with his grip, has trouble standing, sitting or lying down too long and is in pain "99 hours a day." (382)

Plaintiff described neck pain that radiates throughout his back and shoulders and into his arms and hands. (385) Plaintiff testified that his neck "snaps" and he gets black and white dots in front of his eyes, his lower back hurts and radiates into his calf and his toes are numb. (386-87) Plaintiff testified that he has trouble with his hands, including grip strength and pain.  (393-95)

Plaintiff doesn't take any medication other than Tylenol Extra Strength because it makes him nauseated and he doesn't trust it.  (395) Plaintiff did do woodwork as a hobby, but it was never heavy work, and he worked in "spurts" ... "whatever [he] could do until [his] hands started acting up again."  (397) He hadn't done any woodworking prior to October, 1995.

1    At the conclusion of the hearing, the ALJ held the record open and ordered a
2  consultative examination and X-ray of his lumbosacral spine.  (398-99)

3    **Plaintiff's Testimony - Second Hearing**

4    Plaintiff testified that he continues to live in his truck, while occasionally staying
5  overnight with a friend.  (43) The last job, prior to the job he had during which he was
6  injured, was a job as a roofer.  (43) The job involved lifting up to fifty or sixty pounds.  (44)
7  His last job working in a machine shop involved bending, lifting approximately thirty to forty
8  pounds, stretching and reaching.  (45) Plaintiff testified that he had not worked since 1991.
9  (45)

10    Plaintiff testified that his hands won't hold anything "long term," and he drops things
11  all the time. (51) Plaintiff's back continues to hurt, he has pain in his neck and legs also, and
12  he can't sleep more than three to four hours a day.  (51-52) Plaintiff testified that he has
13  difficulty walking, and that his problems are getting worse as time goes by.  (52)

14    Plaintiff had surgery on his right hand, but he still has the same problems, and still has
15  carpal tunnel in his left hand.  (52) Plaintiff testified that the Worker's Comp he received
16  from the injury in Ohio has been negligent in paying his bills, and so he hasn't been able to
17  receive further medical treatment for his back problems.  (54)

18    Plaintiff testified that his emotional problems were getting worse, and that he doesn't
19  want to live anymore. (55) During the day he waters his plants or does his dishes, or maybe
20  runs some errands for an 80 year old friend of his.  (55) Plaintiff testified that it is difficult
21  to dress himself.  (57)

22    Plaintiff testified that he was still not taking medication, that medication made him
23  sick to his stomach, that he was allergic to codeine, and that he only takes Tylenol extra-
24  strength.  (56)

25    **Vocational Expert's Testimony - Second Hearing**

26    Ruth Van Vleet, a vocational expert testified that she had reviewed the vocational
27  exhibits in the case prior to the hearing.  (61)  The ALJ asked her to presume an individual
28  42 years of age with a high school equivalency who was limited to light work, and asked if

1  the Plaintiff would have skills that would be transferable.  (63) Ms. Van Vleet testified that

2  the skills would not be transferable.  (Id.)  The ALJ asked her to further consider that the

3  Plaintiff would be limited with handling and fingering and repetitive movements with his

4  dominant right hand, and asked whether there would be any jobs in the local or national

5  economy that the Plaintiff could perform.  (64)

6      Ms. Van Vleet replied that, given those limitations, Plaintiff would be able to work

7  as a security or gate guard, and, if he were able to handle change, he could work as a parking

8  lot attendant, which there where 867,000 such jobs nationally, and 20,000 such jobs in

9  Arizona.  (64)

10      Plaintiff's attorney posed a further restriction, regarding his psychiatric problems, such

11  as depression, and his thoughts of killing himself, and Ms. Van Vleet agreed that it would

12  definitely limit his ability to be a security guard.  (66)

13      Plaintiff's attorney posed many further restrictions addressed by Ms. Van Vleet, such

14  as taking change on a fast basis, lack of dexterity, numbness and problems in his hands,

15  mental conditions, dealing with the public relationships with people, and Ms. Van Vleet

16  agreed in all those situations that it would alter the hypothetical posed by the ALJ.  (68-69)

17      At the conclusion of the hearing, the ALJ held the record open to obtain a consultative

18  psycho-physiological examination from Dr. Elaine R. Nicholson and a Neuro-psychological

19  consultative evaluation from Dr. James Rowe (sp).  (73)

20      **Plaintiff's Testimony - Third Hearing**

21      Plaintiff appeared unrepresented at his third and final hearing.  (432) Plaintiff testified

22  that he was living in a camper in a friend's driveway.  (435) Since the last hearing, Plaintiff

23  had three more surgeries, two trigger release surgeries on his right hand, and a surgery on his

24  left hand.  (445)

25      Plaintiff testified that his head still hurts, and he gets pain and loss of vision when he

26  turns his head in quick motions.  (451) Plaintiff has shooting pains throughout his body and

27  the sensation of "bugs crawling" on him.  (Id.)  The bicep tendon in his right arm needs to

28  be reattached and he had a torn rotator cuff.  (Id.)  Since the last hearing Plaintiff was

diagnosed with diabetes. (451-52) Plaintiff's hands get stiff and quit working, with the right hand worse than the left. (452) Plaintiff's right leg gives out on him "about every day." (452) Plaintiff testified that his physician believes that he had rheumatoid arthritis. (453) Plaintiff gets headaches four or five times a week, and pain in his neck that radiates down, particularly his right side. (453)

Plaintiff takes medformine twice a day for his diabetes and altocorin for cholesterol. (453, 455) Plaintiff takes Bayer aspirin or he just "deals with" the pain because he can't find medication that he can take without making him sick. (454)

Plaintiff can stand or sit in a chair approximately ten minutes without moving around or having to get up and change positions. (455) Plaintiff can walk one or two hundred feet and then he has to stop. He can carry a bag of groceries, approximately two gallons of milk, in his left hand, and one gallon of milk in his right. (455-56) Plaintiff uses both hands to brush his teeth, and can zip his pants with his right hand, but doesn't tie his tie shoes, just slips them on. (456) Plaintiff testified that he can't sleep more than two hours at a time because of the pain in his body. (457)

Plaintiff was seeing Dr. Nicholson for mental health treatment, "off and on." (457-58) He did not receive any medication, although Dr. Nicholson wanted to prescribe medication, because he couldn't afford to pay for it, and he didn't want it prescribed. (458) Plaintiff testified that he didn't want to be around people, that he gets upset being around people, and stays away from them the best he can. (458)

Plaintiff spends his time watching TV, does shopping and laundry for himself, cooks for himself, and cleans up his camper, although he can't do it all "at one shot." (460)

B.    Medical Evidence

1.    Physical Impairment

Dr. Moats submitted a report to the Bureau of Worker's Compensation stating the Plaintiff was first seen by Dr. Moats on May 21, 1991, complaining of neck pain with occasional tingling in fingers following an injury at work. (118) Dr. Moats objective physical findings and diagnosis were as follows: "Tenderness of lower posterior neck.

1   Rotation of neck limited due to pain bilaterally.  Reflexes normal.  Xrays normal.  Diagnosis:
2   Cervical strain."  (118)

3       Dr. Moats submitted a report on July 16, 1991 that indicated the results of an MRI
4   (179) as follows: "1. Mild C5-C6 & C7-T1 Disk space narrowing.  2. Mild 'Hard disk Bulg'
5   at C5-C6 with evidence of focal disk herniation.  3. No spinal stenosis."  (119)

6       Dr. Isa Canavati also submitted, on behalf of Plaintiff's Worker's Compensation claim,
7   a "Statement of Physician" which stated that Dr. Canavati first saw Plaintiff on June 6, 1991,
8   and reported the following objective physical findings: "Moderate degree of paravertebral
9   spasm in the cervical region, particularly on the right with limitation of right lateral rotation
10  at 25°, extension 10°, flexion 30°.  Deep tendon reflexes appeared symmetrical.  Sensory
11  exam showed diffuse hyperesthesia to pinprick over the dorsum of the forearm.  Xrays
12  showed  narrowing of C5-6 disc space."  (113)

13      A report submitted to the Ohio Bureau of Workers' Compensation by Dr. Canavati on
14  October 3, 1991, reported that Plaintiff's "arm pain has improved, although he does have
15  persistent numbness of the hands.  MRI of the cervical region did show osteoarthritic spur
16  at C5-C6 junction with some compromise at C5-6 neuroforamina."  (114)

17      Dr. Grose examined Plaintiff on July 5, 1994, and reported that, after apparent efforts
18  to improve his physical status and clear motivation to return to work, Plaintiff's "primary
19  disabling symptoms are neck and upper extremity pain."  (195) Dr. Grose opined that due to
20  Plaintiff's motivation to work, he believed a rehabilitation program would benefit Plaintiff,
21  but that he should have a complete evaluation including a neurological consultation and an
22  MRI scan, and should be referred to a physiatrist.  (195) Dr. Grose viewed his "most likely
23  diagnosis" to be chronic pain syndrome secondary to fibromyalgia.  (196)

24      Dr. Sorrentino assumed care of Plaintiff in October, 1994. (244) Dr. Sorrentino noted
25  that Plaintiff failed to follow up with Dr. Grose's recommendation of visiting a physiatrist
26  for a rehabilitation medicine program.  (245)  Dr. Sorrentino did not observe any objective
27  evidence of muscle wasting in the upper or lower extremities to suggest a denervation type
28  of injury.  (246)  Dr. Sorrentino disagreed with Dr. Grose's impression of the origin of

Plaintiff's discomfort. (246) Dr. Sorrentino's impression was chronic cervical strain; chronic lumbar strain; rule out degenerative disc disease of the cervical and lumbar spines. (246) Dr. Sorrentino ordered additional MRI studies of Plaintiff's spine to exclude both progression in degenerative change in the cervical spine and lumbar spine and the possibility of spinal stenosis. (247)

By February 28, 1995, still awaiting approval for the MRI studies, Dr. Sorrentino reported that Plaintiff was developing significant atrophy which he believed to be denervation in origin. (235)

The MRI examination took place in May, 1995, and the results showed mild disk narrowing at C5-6 and C7-1 levels with mild anterior spurring associated, but was otherwise negative. (231)

On October 2, 1995, Dr. Harvey Goodman examined Plaintiff and summarized the results of a previous EMG nerve conduction study performed on September 21, 1995 (216-220) showing moderate to severe right median nerve entrapment of his wrist and moderate left median nerve entrapment of the wrist. (214-15)

On March 29, 1996, a state physician evaluated Plaintiff's claim, from May 16, 1991 to September 30, 1991, and completed a Residual Physical Functional Capacity ("RFC") Assessment form. (147) The state physician found that Plaintiff could occasionally lift 20 pounds, and frequently lift 10. Plaintiff could stand or sit 6 hours in an 8 hour work day, and his ability to push and/or pull was unlimited. Plaintiff's only postural limitations were occasional limitations of climbing ladders/ropes/scaffolds. (149) Plaintiff had no manipulative, visual, communicative, or environmental limitations. (150-51)

A second RFC dated the same date was identical in all respects except that it noted manipulative limitations in the right hand based on decreased sensation in Plaintiff's right median nerve distribution. (157)

Dr. Robert Sorrentino submitted a letter to the Ohio Bureau of Worker's Compensation stating that he had been following Plaintiff since October, 1994. (197) Dr. Sorrentino's most recent examination, performed on March 7, 1996, showed Plaintiff to have

significant paracervical and trapezius spasm with marked spasm and tremors in all muscle groups surrounding the neck and upper shoulder girdle.  (197) Plaintiff's grip strength continued to be markedly decreased with sensory loss.  (197)  Dr. Sorrentino noted, in the interval 18 months, Plaintiffs condition evidenced a gradual worsening, both in range of motion and in motor strength, and also in the appearance of course motor tremors in the muscular of the neck and proximal portion of the shoulder girdle.  (197)

A third RFC dated May 13, 1996, added the additional manipulative limitations of handling and fingering due to Plaintiff's carpal tunnel syndrome, and limitation of repetitive movements.  (168)

Plaintiff was examined by Dr. Grossman, a consultative examiner, for a disability evaluation, on November 26, 1996.  (250) Dr. Grossman found that, on the basis of his examination, Plaintiff did have some minimal limitations in his activities as follows: Standing: six hours; Sitting: six hours; Walking: Two or three miles; Lifting: 45-50 pounds; 25 pounds frequently; Needs to change positions occasionally; Activities such as bending, crouching, kneeling and squatting, stooping and reaching: in moderation; Climbing: In moderation. (258) Dr. Grossman felt that the Plaintiff could do some medium type work on a regular basis. (259)

Dr. John D. Hayden performed a carpal tunnel release on Plaintiff's hand on November 25, 1997. (896-98) Dr. Hayden reported that following the surgery, Plaintiff was limited to light office work with no repetitive tasks or tasks requiring either high or low force with either hand.  (875)  Dr. Hayden based his recommendations on positive nerve conduction studies, numbness and tingling, as well as his examination of Plaintiff for carpal tunnel syndrome.  (875)  Dr. Hayden also reported that Plaintiff might need a release on the other side.  (875)

On September 24, 1998, Dr. Hess scheduled surgery for trigger fingers in Plaintiff's long and ring fingers after steroid injections failed to benefit Plaintiff.  (331) Examination of Plaintiff revealed classic tendon nodules but no evidence of triggering.  (331) The surgery was canceled due to difficulties with Plaintiff's insurance coverage.  (331)

1          A letter written by Dr. Madden in December, 1998, indicated that Plaintiff continued

2   to have median nerve compression at the left wrist, and stenosing tenosynovitic popping of

3   the long and ring fingers on the right hand.  (313) Dr. Madden believed that both problems

4   could be resolved through surgery.  (314) After approval for the procedure in April, 2001,

5   (719), Dr. Madden operated on Plaintiff's right long and ring fingers on April 24, 2001, with

6   apparently good results.  (716)

7          Charles Blake, M.D., completed an impairment examination on September 28, 2001.

8   (681) Dr. Blake diagnosed Plaintiff with bilateral carpal tunnel syndrom, worse on the right

9   side, with decreased sensation in both hands and typical nerve distributions in the hands with

10   a history of a trigger finger release in the right hand.  (682)  The trigger finger release

11   resulted in full range of motion and no obvious strength loss.  (682)

12          Jeri B. Hassman, M.D., treated Plaintiff from July, 2001 to September, 2002.  (520-

13   548)   In July, 2003, Plaintiff presented to Dr. Hassman for a recheck.  (546) Dr. Hassman

14   found "significant weakness of the right upper extremity, especially weakness of the right

15   shoulder, and right should testing produces severe right neck pain and right shoulder pain.

16   He has weakness for right elbow flexion and extension and weakness of the right hand

17   secondary to carpal tunnel syndrome and trigger fingers.  He has weakness of the left hand

18   secondary to left carpal tunnel syndrome."  (547)  Dr. Hassman concluded, after reviewing

19   Plaintiff's medical records and examining Plaintiff, that Plaintiff "has a permanent

20   impairment of his right shoulder based upon the tendinopathy, which results in pain and

21   decreased range of motion of the right shoulder.  He also has a permanent impairment of the

22   cervical spine based upon decreased range of motion, muscle spasm and radicular pain."

23   (548)

24          Scott A. Krasner, M.D., P.C., examined Plaintiff in January, 2004 at the request of the

25   Industrial Commission of Ohio.  (608)  Dr. Krasner found no objective evidence of

26   radiculopathy. (613) Dr. Krasner concluded that Plaintiff's examination failed to demonstrate

27   any significant objective findings.  (613) The only finding on exam was decreased range of

28   motion to his right shoulder, and Dr. Krasner was not sure that was consistent or physiologic.

1   (614) Dr. Krasner saw no medical indication based on his history and examination for any

2   physical restrictions, and felt he was medically able to perform regular, unrestricted work.

3   (614) Dr. Krasner cleared Plaintiff to perform "Heavy Work."  (615)

4       2.   <u>Mental Impairment</u>

5       Elaine R. Nicholson, Ph.D., first evaluated Plaintiff on June 20, 1997.  Dr. Nicholson's

6   conclusion about Plaintiff's presentation was that he was "extremely desperate, over-reactive

7   psychophysically and depressed.  He is not psycho-socially functioning at an appropriate

8   level.  He has exceeded what would be classified as rational appropriate cognitive response

9   to his situation."  (311)  Dr. Nicholson opined that she strongly doubted that he could be

10  gainfully employed based on his emotional state at the present time, and she would guess that

11  any employer would find it difficult to have Plaintiff working as long as he continues to be

12  as disturbed about his present socioeconomic state and physical condition.  (311) Dr.

13  Nicholson diagnosed Plaintiff with Axis I Major Depress Disorder: Single Episode; Anxiety

14  Disorder due to a medical condition; Axis II Personality Disorder NOS - rule out and Axis

15  III Generalized Pain with a GAF[2] of 35.  (311)

16      Plaintiff was referred to Dr. Nicholson again for evaluation on March 11, 1999. (348)

17  Again, Dr. Nicholson found Plaintiff to be extremely desperate, overreactive

18  psychophysiologically, and severely depressed.  (351) Dr. Nicholson further found him to

19  be highly dependent upon the medical profession to find answers and solutions to his

20  problems. (351) Dr. Nicholson's opinion, to a reasonable degree of probability, was that the

21  results of his current psychological status was due to the physical injury and subsequent

22  treatment and outcomes, and strongly doubted that he could be gainfully employed at the

23  present time. (351) Dr. Nicholson stated that this type of profile "suggests a poor prognosis

24

25  _____

26      [2]"GAF" refers to the Global Assessment of Functioning Scale found in Diagnostic and
    Statistical Manual of Mental Disorders (4th Ed., Text Rev. 2000) at 34.  A GAF rating of 31-

27  40 reflects major impairments in several areas such as work or school, family relations,
    judgment, thinking or mood, for example, a depressed man who avoids friends, neglects his

28  family and is unable to work.

for psychological intervention, although it is clearly suggested that this person would need some type of psychiatric help." (351)  Dr. Nicholson diagnosed Plaintiff with Axis I Major Depression disorder and Pain Disorder: Psychological and Medical Condition; Axis II Dependent Personality Disorder; and Axis III Generalized Pain, with a GAF of 31.  (351)

Plaintiff was referred to James Rau, Ph.D., for a consultative examination on May 5, 1999.  (352) Dr. Rau assessed Plaintiff as clearly "remarkably frustrated with the overall system that has been processing his situation and clearly he is clinically depressed.  His premorbid behavioral style along with the depression I think has caused a havoc with pain management and I think that the diagnosis of a pain disorder is justified.  I think the depression is rather chronic by now and in the moderate range. ... Socially of course, there are remarkable problems mainly in terms of impulsive anger and a baseline level of irritability.  Clearly, it doesn't take too much to set him off." (358) Dr. Rau opined that "the prognosis is quite poor in this case." Dr. Rau stated that "his intensity and his depression are most likely affecting his perception of pain and so he is caught in a vicious cycle right now between pain, emotional reactivity, social reactivity, and more pain."  (358)  Dr. Rau diagnosed Plaintiff with Axis I: Major depressive disorder, moderate, chronic; pain disorder associated with both psychologic factors and a general medical condition - chronic; Axis II: None; and Axis III; in general, chronic pain.  (359)

Dr. Rau completed a Medical Source Statement (Mental) and noted that Plaintiff's ability to follow work rules, relate to co-workers, deal with public use judgment with the public, interact with supervisors, deal with work stresses maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability were at best, fair.  (361-62)

Joseph Geffen, Ph.D., P.C., completed an examination of Plaintiff on February 3, 2000 on behalf of the Ohio Bureau of Worker's Compensation. (513) Dr. Geffen diagnosed Plaintiff with Major Depressive Disorder, Single Episode, and Anxiety Disorder Due to Medical Condition.  (516)  Dr. Geffen opined that the "psychological conditions requested do prevent Mr. Mauk from returning to work both, in terms of his ability to successfully

1   obtain employment, and if he were somehow able to find a job his ability to maintain

2   employment.  Whether or not the client could return to employment of any kind would

3   depend on whether or not his psychological conditions are successfully treated." (516)

4       Plaintiff was referred to Alice F. Chang, Ph.D., a licensed clinical psychologist, in

5   January, 2001, for an evaluation of his condition of major depressive disorder.  (517) Dr.

6   Change reported that the Plaintiff "is severely depressed and after this many years, while it

7   may be a single episode of depression, it is reaching the chronic stage with severe feelings

8   of hopelessness, suicidal ideation, and helplessness."  (519)

9       Dr. Nicholson completed a Summary Report for Plaintiff's industrial claim in Ohio

10  in August, 2003[3].  (550) Dr. Nicholson reported that she had received a letter from Plaintiff's

11  attorney in April, 2000, authorizing psychotherapy sessions, which continued on a fairly

12  consistent basis. (551) Dr. Nicholson encouraged him to engage in any productive tasks, and

13  these seemed to alleviate his feelings of hopelessness, however, they increased his pain levels

14  until he had to quit the tasks.  (551)

15      Dr. Nicholson's treatment notes from January, 2004, indicated continuing moderate

16  depression and anger. (607)

17      Plaintiff was referred by the Disability Determination Services to Dr. Rau for the

18  evaluation of his neuropsychologic status in April, 2004.  Dr. Rau reported that there were

19  no clear indications of any neurocognitive problems. (556) Dr. Rau did note that there is still

20  a clinical level depression. (557) Dr. Rau diagnosed Plaintiff with major depressive disorder

21  without psychosis and opined that, in regards to his basic psychosocial cognitive capabilities:

22  "I would not expect him to have any problems managing the baseline cognitive requirements

23  of any performance-based activity.  It would be expected that there would be times however

24  when his pain would get him angry and then he would have decompensation, perhaps

25

26      [3]Numerous treatment notes from Dr. Nicholson are dispersed throughout the
    administrative record and are generally consistent with Dr. Nicholson's evaluations and
27  summarizations.  (TR 607, 627, 629, 632, 665-66, 668, 685, 690-91, 699, 702-03,710-11,
28  730-31, 735, 737-38)

1  something like I saw last time.  So, the depression plays a role.  I think there would likely be

2  some problems as well managing the social and emotional requirements of any performance-

3  based activity because of the pain disorder, as well as due to the pain, but from a behavioral

4  perspective, his reactions [sp] to pain is definitely in the clinical range and this is a mental

5  disorder."  (557)

6      **3.   Vocational Evidence**

7          Jeffrey R. Wesley, a rehabilitation counselor and vocational expert reviewed Plaintiff's

8  file as provided by Plaintiff's counsel following the denial of benefits after Plaintiff's second

9  hearing.  Mr. Wesley was of the opinion that, when you have an individual with the limited

10  background and lack of transferable skills that Plaintiff has, and limit him to light work and

11  particularly with any restrictions to the use of his hands, that profile results in the individual

12  being unable to perform any jobs in the national economy.  (508) Mr. Wesley further found

13  that, if Dr. Nicholson's and Dr. Rau's findings were considered regarding Plaintiff's mental

14  limitations, Plaintiff's profile demonstrates a very poor prognosis for an ability to sustain

15  work activity whatsoever.  (509) Mr. Wesley concluded that "the vocational aspects of Mr.

16  Mauk's case should absolutely result in a finding of there being no jobs in the economy

17  which this individual can perform.  I also find that the Judge's failure to utilize a

18  psychological hypothetical in his questioning of the vocational expert to be questionable, and

19  I believe that his acceptance of his vocational expert's conclusion that there are light,

20  unskilled types of work which Mr. Mauk could do is also very questionable."  (509)

21  **The Commissioner's Decision - Third Hearing**

22          Following the third administrative hearing, the ALJ made the following findings on

23  January 16, 2004:

24      1.   The claimant met the disability insured status requirements of the Act on
            May 16, 1991, the date the claimant stated he became unable to work, and
25           continues to meet them through June 30, 1992.

26
27      2.   The claimant has not engaged in substantial gainful activity since the
            alleged onset date.

28

3. The claimant's impairments which are considered to be "severe" within the meaning of the Social Security Act and Regulations are: bilateral carpal tunnel syndrome; status post operative release on the right; status post ligamentous strains of the cervical and lumbosacral spine; and major depressive disorder.  He does not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 CFR 404, Subpart P, Appendix 1.

4. There is a medically determinable impairment(s) that could reasonable be expected to produce the individual's pain or other symptoms.  The claimant's allegations are found **not** to be fully credible for the reasons set forth more fully above.

5. The claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of light work except as limited by the inability to handle, finger, or perform repetitive movements with the hands as well as psychological limitations which limit him to superficial, brief contact with the public (20 CFR 404.1545 and 416.945).

6. The claimant is unable to perform his past relevant work as a roofer or laborer.

7. The claimant was 35 years old, as of the alleged onset date and is now 48, which is defined as a younger individual (20 CFR 404.1563 and 416.963).

8. The claimant has a high school education (20 CFR 404.1564 and 416.964).

9. The claimant does not have any acquired work skills, which are transferable to the skilled or semiskilled work functions of other work (20 CFR 404.1568 and 416.968).

10. Based on an exertional capacity for light work and the claimant's age, education, and work experience, the testimony of the vocational expert would support a finding of "not disabled."

11. Furthermore, 20 CFR 404.1569 and 416.969, and 20 CFR 404 Subpart P, Appendix 2, Rule 202.21, Table No. 2, would direct a conclusion of "not disabled."

12. The claimant's capacity for the full range of light work has not been significantly compromised by additional non-exertional limitations.  Accordingly, using the above-cited rule as a framework for decision-making, the claimant is not disabled.

13. The claimant is not under a "disability," as defined in the Social Security Act (20 CFR 404.1520(f) and 416.920(f)).

(403-16)

1    The ALJ concluded that, based on the objective diagnostic tests as well as multiple

2    essentially benign physical exams, the alleged intensity, persistence, and limiting effects of

3    claimant's pain and other symptoms were inconsistent with the medical record.  (411)  The

4    ALJ further noted that, overall, the clinical and laboratory findings appear to be

5    disproportionate to the severity of pain and psychological symptoms Plaintiff had alleged.

6    (411)

7    The ALJ noted in support of her findings that although the Plaintiff testified to severe,

8    unremitting pain, the record reflected that there were large gaps of time between visits to the

9    doctor (or any other health care professional) seeking relief from that pain.  (411) The ALJ

10   also noted that although Plaintiff alleged his psychological problems started shortly after his

11   1991 injury, he did not seek ongoing mental health care until May 2000.  (411)

12   The ALJ also noted that there were repeated indications by his treating and examining

13   physicians that Plaintiff was either exaggerating his symptoms and/or that he was not really

14   trying to perform the routine tests required of him.  (411-12) Furthermore, a number of

15   physicians commented on the presence of calluses, indicative that Plaintiff was performing

16   hard work with both hands. (412) In addition, although the Plaintiff complained of constant

17   pain, he often refused pain medication, and took only over the counter medications.  (412)

18   The ALJ noted that there were numerous references in the medical evidence which

19   were indicative of the Plaintiff's non-compliance with the medical regimen specified by his

20   physicians.  (412) The ALJ asserted that the Plaintiff's non-compliance does not support the

21   alleged intensity and duration of pain and subjective complaints.  (412)

22   The ALJ rejected Dr. Sorrentino's opinion for several reasons.  First, the ALJ reasoned

23   that Dr. Sorrentino's report of Plaintiff's rather marked functional limitations in April 1997

24   was approximately 11 months after his last evaluation, thus raising some question as to the

25   weight it should be given.  (413)  In addition, his assessment was contrary to those made by

26   Drs. Delaney and Hayden, who reported limitations inconsistent with the reported

27   limitations, as well as findings that indicated that Plaintiff was performing heavy work with

28

1   his hands.  (413) The ALJ describes Dr. Sorrentino's reports as a mischaracterization of the

2   clinical evidence.  (413)

3          The ALJ noted that Dr. Hassman concluded that the Plaintiff was unable to work in

4   part due to a shoulder impairment, for which a referral to an orthopedic specialist for further

5   evaluation was warranted, but noted that there was no documentation that this was ever

6   accomplished.  (413) The ALJ found Dr. Hess' functional assessment that the Plaintiff was

7   capable of light office work which did not involve repetitive tasks to be quite compelling.

8   (413)

9          The ALJ noted that Dr. Grossman and Dr. Steinberg, both consulting physicians,

10  opined that Plaintiff could perform medium and light to medium work with postural

11  limitations, respectively, but, giving the benefit of the doubt to Plaintiff, afforded greater

12  weight to the opinions of the non-examining Disability Determination Service physicians.

13  (The Residual Functional Capacity Assessments, found at 147-154, 155-162, 165-172)(413)

14         The ALJ noted that Dr. Nicholson's 1997 and 1999 reports were prepared for purposes

15  of litigation rather than as the result of any ongoing treatment relationship.  (413) The ALJ

16  also noted that Dr. Delaney did not observe any sign of mental illness at the time of his exam

17  in May 1995.  (413) The ALJ also found significant that the findings and conclusions of

18  psychological exams by Dr. Nicholson were based to a significant degree on invalid MMPI

19  test results, the extent of which suggested a number of possibilities including the possibility

20  that the claimant had been making false assertions.  (413) The ALJ also found that Dr.

21  Nicholson's opinion that the Plaintiff would not benefit from psychological intervention but

22  should have "some type of psychiatric help" to be curious and contradictory.  (413) The ALJ

23  found that Dr. Nicholson's opinion that Plaintiff's GAF of 31 is contrary to the evidence of

24  record.   (413)  For these reasons, the ALJ attributed little weight to the opinions and

25  conclusions of Dr. Nicholson.  (413-14)

26         The ALJ found that although Dr. Rau noted that Plaintiff had problems with anger and

27  irritability, Dr. Rau's ratings of fair to no ability in several functional areas are simply not

28

1    consistent with either the Plaintiff's demonstrated ability to control his impulsivity and

2    irritability or the reported level of social activities.  (414)

3        Although the ALJ found that Plaintiff had been diagnosed with major depressive

4    disorder, which is found in Medical Listing 12.04, 20 CFR Part 404, Appendix 1 of Subpart

5    P, the ALJ found that his mental disorder is not so severe that it meets or equals Listing

6    12.04.  The ALJ found that he has mild restrictions in his activities of daily living; has

7    moderate difficulties in maintaining social functioning; and has no difficulties in maintaining

8    concentration, persistence and pace; and no episodes of decompensation.  (414) The ALJ

9    found that the evidence did not establish the presence of the "C" criteria.  (414)

10       The ALJ found that the Plaintiff retained the ability to lift and carry 20 pounds

11   occasionally and 10 pounds frequently; to sit, stand, and/or walk for about six hours in an 8-

12   hour day with normal breaks.  (414) Plaintiff would be limited, however, by his ability to

13   handle, finger, or perform repetitive movements with the hands.  Additionally, he would

14   work best in an environment with superficial, brief contact with the public.  The ALJ found

15   no other exertional or non-exertional limitations.  (414)

16       The ALJ found that the hypothetical questions asked of the vocational expert ("VE")

17   during the March 1999 hearing accurately described an individual of the Plaintiff's

18   background and functional limitations.  (414) The VE identified jobs the Plaintiff could

19   perform within his RFC, there were a significant number of these jobs in the national

20   economy, and her testimony was consistent with the information contained in the Dictionary

21   of Occupational Titles (Social Security Ruling 00-4p).  (414-15)

22       Accordingly, the ALJ found that given the Plaintiff's exertional capacity for light

23   work, his age, education, and work experience, the testimony of the VE would support a

24   finding of "not disabled."  (415) Furthermore, the ALJ found that 20 CFR 404.1569 and

25   416.969, and 20 CFR 404 Subpart P, Appendix 2, Rule 202.21, Table No. 2, would direct a

26   conclusion of "not disabled."  (415) In addition, the ALJ found that the Plaintiff's capacity

27   for the full range of light work had not been significantly reduced by his non-exertional

28   impairments. (415)

1    **III- ISSUES**

2    **A.      Plaintiff's Position**

3          Plaintiff argues in his Motion for Summary Judgment that the Commissioner erred as

4    follows:

5                1.    By discounting the opinions of Plaintiff's treating psychologist and the

6                      examining consulting psychologist regarding Plaintiff's psychological

7                      limitations.

8                2.    By relying on vocational testimony from a prior hearing to conclude

9                      the Plaintiff could perform other work.

10               3.    By making an alternative finding that Plaintiff was not disabled based

11                     upon the Medical Vocational Guidelines ("Grid").

12   **B.      Defendant's Position**

13         Defendant asserts in response that a remand is appropriate in situations when further

14   development of the record is necessary, and, in this case, would remedy defects in the

15   original administrative proceedings and would allow clarification of Plaintiff's nonexertional

16   limitations and supplemental vocational testimony to clarify whether there are a significant

17   number of jobs in the national economy which Plaintiff can perform.

18   **IV.     DISCUSSION**

19   **A.      Standard of Review**

20         An individual is entitled to Title II Social Security Disability Insurance benefits

21   ("SSDIB") if the individual is insured for those benefits, has not attained retirement age, has

22   applied for those benefits, and is disabled.  42 U.S.C. § 423(a)(1).  An individual is entitled

23   to Title XVI Supplemental Security Income Disability benefits ("SSI") if the individual is

24   disabled and meets certain eligibility requirements.  42 U.S.C. § 1381(a).  The definition of

25   disability for SSDIB and SSI purposes is the same: the inability "to engage in any substantial

26   gainful activity by reason of any medically determinable physical or mental impairment

27   which can be expected to result in death or which has lasted or can be expected to last for a

28

continuous period of not less than twelve months." Compare 42 U.S.C. § 423(d)(A) with 42 U.S.C. § 1382c (a)(3)(A).

The Ninth Circuit has stated that "'a claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the national economy.'" *Penny v. Sullivan,* 2 F.3d 953, 956 (9th Cir. 1993) (*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

The claimant has the burden to establish a prima facie case showing an inability to engage in previous occupations. *Thompson*, 665 F.2d at 939. The burden then shifts to the Commissioner to show that other substantial work, for which the claimant is qualified, exists in the national economy. *Id.* (citing *Hall v. Secretary of HEW*, 602 F.2d 1372, 1375 (9th Cir. 1979); *Cox v. Califano*, 587 F.2d 988, 990 (9th Cir. 1978)).

The court will set aside a denial of benefits only if the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole. *Kail v. Heckler*, 722 F.2d 1496, 1497 (9th Cir. 1984) (citing *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir.1982), *Thompson v. Schweiker*, 665 F.2d 936, 939 (9th Cir.1982)); 42 U.S.C. § 405(g)). In determining whether there is substantial evidence, the Court must consider the evidence as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

Substantial evidence is "more than a scintilla," *Richardson v. Perales*, 402 U.S. 389, 401 (1971), but "less than a preponderance." *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); *Desrosiers v. Secretary of Health and Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). A denial of Social Security benefits will be set aside if the Commissioner fails to apply proper legal standards in

1   weighing the evidence even though the findings may be supported by substantial evidence.

2   *Winans,* 853 F.2d at 644.

3          The Commissioner, not the court, is charged with the duty to weigh the evidence,

4   resolve material conflicts in the evidence and determine the case accordingly. *Id.* However,

5   when applying the substantial evidence standard, the court should not mechanically accept

6   the Commissioner's findings but should review the record critically and thoroughly. *Day v.*

7   *Weinberger*, 522 F.2d 1154 (9th Cir. 1975). Reviewing courts must consider the evidence

8   that supports as well as detracts from the examiner's conclusion. *Id*. at 1156. Moreover, "if

9   the evidence can support either outcome, the court may not substitute its judgment for that

10  of the ALJ." *Matney,* 981 F.2d at 1019

11         Disability claims are evaluated pursuant to a five-step sequential process. 20 C.F.R.

12  §§404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991). The first step

13  requires a determination of whether the claimant is engaged in substantial gainful activity.

14  20 C.F.R. §§ 404.1520(b), 416.920(b). If so, then the claimant is not disabled under the Act

15  and benefits are denied. *Id.* If the claimant is not engaged in substantial gainful activity, the

16  ALJ then proceeds to step two which requires a determination of whether the claimant has

17  a medically severe impairment or combination of impairments. 20 C.F.R. §§ 404.1520(c),

18  416.920(c). In making a determination at step two, the ALJ uses medical evidence to

19  consider whether the claimant's impairment more than minimally limits or restricts the

20  claimant's physical or mental ability to do basic work activities. *Id*. If the ALJ concludes

21  that the impairment is not severe, the claim is denied. *Id*. Upon a finding of severity, the

22  ALJ proceeds to step three which requires a determination of whether the impairment meets

23  or equals one of several listed impairments that the Commissioner acknowledges are so

24  severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d), 416.920(d); 20

25  C.F.R. Pt. 404, Subpt. P, App.1. If the claimant's impairment meets or equals one of the

26  listed impairments, then the claimant is presumed to be disabled and no further inquiry is

27  necessary. If a decision cannot be made based on the claimant's then current work activity

28  or on medical facts alone because the claimant's impairment does not meet or equal a listed

impairment, then evaluation proceeds to the fourth step.  The fourth step requires the ALJ to consider whether the claimant has sufficient residual functional capacity ("RFC")[4] to perform past work.   20 C.F.R. §§ 404.1520(e), 416.920(e).  If the ALJ concludes that the claimant has RFC to perform past work, then the claim is denied.   *Id*.  However, if the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience. 20 C.F.R. §§ 404.1520(f). 416.920(f).  At step five, in determining whether the claimant retained the ability to perform other work, the ALJ may refer to Medical Vocational Guidelines ("grids") promulgated by the SSA.  *Desrosiers,* 846 F.2d at 576-577.  The grids are a valid basis for denying claims where they accurately describe the claimant's abilities and limitations.  *Heckler v. Campbell,* 461 U.S. 458, 462, n.5 (1983).  However, because the grids are based on exertional or strength factors, where the claimant has significant nonexertional limitations, the grids do not apply.  *Penny,* 2 F.3d at 958-959; *Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998). Where the grids do not apply,  the ALJ must use a vocational expert in making a determination at step five.  *Desrosiers,* 846 F.2d at 580.

**B.     Medical Source Opinions**

The Ninth Circuit distinguishes among the opinions of three types of physicians:  (1) those who treat the claimant (treating physicians);  (2) those who examine but do not treat the claimant (examining physicians);  and (3) those who neither examine nor treat the claimant (nonexamining physicians). *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), as amended (Apr. 9, 1996).

"Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing

---

[4]Residual functional capacity is defined as that which an individual can still do despite her limitations.  20 C.F.R. § 404.1545.

1   physician's." *Holohan v. Massanari*, 246 F.3d 1195,  1202 (9th Cir. 2001) (citing *Lester*, 81

2   F.3d at 830 ;  20 C.F.R. § 404.1527(d).  In addition, the regulations give more weight to

3   opinions that are explained than to those that are not and more weight to the opinions of

4   specialists concerning matters relating to their specialty over that of nonspecialists. *Holohan*,

5   246 F.3d at 1202 (citing 20 C.F.R. §§  404.1527(d)(5) and 404.1527(d)(3)).   Under the

6   regulations, if a treating physician's medical opinion is supported by medically acceptable

7   diagnostic techniques and is not inconsistent with other substantial evidence in the record,

8   the treating physician's opinion is given controlling weight.  *Id.*   (citing 20 C.F.R. S

9   404.1527(d)(2);  Social Security Ruling (SSR) 96-2p).

10       More weight is given to a treating physician's opinion than to the opinion of a

11   nontreating physician because a treating physician "is employed to cure and has a greater

12   opportunity to know and observe the patient as an individual." *Andrews v. Shalala*, 53 F.3d

13   1035, 1041 (9th Cir. 1995) (quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (quoting

14   *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987))).   "Likewise, greater weight is

15   accorded to the opinion of an examining physician than a non-examining physician."

16   *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995)(citing 20 C.F.R. § 416.927(d)(1);

17   *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990).

18       The ALJ may reject the opinion of a treating physician, whether or not controverted;

19   however, the ALJ may reject an uncontroverted opinion of a treating physician only for clear

20   and convincing reasons.  *Id.*, at 1041 (9th Cir. 1995).  To meet this burden, the ALJ must set

21   out a detailed and thorough summary of the facts and conflicting clinical evidence, state his

22   interpretation of the facts and evidence, and make findings. *Magallanes v. Bowen*, 881 F.2d

23   747, 751 (9th Cir.  1989).  To reject the opinion of a treating physician which conflicts with

24   that of an examining physician, the ALJ must "'make findings setting forth specific,

25   legitimate reasons for doing so that are based on substantial evidence in the record.' "

26   *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.1987), (quoting *Sprague*, 812 F.2d at 1230);

27   *see also Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)  (adopting this rule).  "The

28   ALJ can meet this burden by setting out a detailed and thorough summary of the facts and

1   conflicting clinical evidence, stating his interpretation thereof, and making findings." *Cotton*

2   *v. Bowen*, 799 F.2d 1403, 1408 (9th Cir.1986).

3   C.   **Remand/Reverse**

4        The district court has discretion to remand for further proceedings or to award

5   benefits. *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir.1989).  Under *Harman v. Apfel*,

6   211 F.3d 1172 (9ᵗʰ Cir. 2000), when evidence has been improperly credited, the following

7   test is used to determine when evidence should be credited and an immediate award of

8   benefits directed:

9        (1) the ALJ has failed to provide legally sufficient reasons for rejecting such

10       evidence, (2) there are no outstanding issues that must be resolved before a

11       determination of disability can be made, and (3) it is clear from the record that the

12       ALJ would be required to find the claimant disabled were such evidence credited.

13   *Harman*, 211 F.3d at 1178 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1292 (9ᵗʰ Cir.1996)).

14   The *Harman* Court further notes that the third prong is really a subcategory of the second:

15   "if the ALJ were not 'required to find the claimant disabled' upon crediting the evidence,

16   then this certainly would constitute an 'outstanding issue . . .  that must be resolved before

17   a determination of disability [could] be made.'" *Id.* (quoting *Smolen*, 80 F.3d at 1292).

18   **D.   Analysis**

19   **1.   Did the ALJ err in discounting the opinions of Plaintiff's treating psychologist**

20        **and the examining consulting psychologist regarding Plaintiff's psychological**

21        **limitations?**

22        Plaintiff argues that the ALJ erred by rejecting Dr. Nicholson's opinions based on the

23   reasoning expressed in the ALJ's findings.

24        The ALJ first expresses as a basis for rejecting Dr. Nicholson's opinion the fact that

25   Dr. Nicholson's reports were prepared for the purposes of litigation. (413) Plaintiff does not

26   disagree with this factual conclusion, however, as Plaintiff notes, the Ninth Circuit has stated

27   "[t]he purpose for which medical reports are obtained does not provide a legitimate basis for

28   rejecting them." *Lester*, 81 F.3d at 832.

1    Second, the ALJ noted that Dr. Delaney did not observe any sign of mental illness

2    when he examined Plaintiff in May 1995.  Dr. Delaney was not asked to, nor did he, perform

3    a psychological examination of Plaintiff.  (229-230) Dr. Delaney, a neurologist, performed

4    a neurological examination of Plaintiff, and, as part of that exam, noted that Plaintiff's mental

5    status was "alert and fully oriented."  (229) This cursory examination of Plaintiff's mental

6    status is not contradictory to Dr. Nicholson's report, nor if it were, would it provide specific

7    and legitimate reasons for rejecting Dr. Nicholson's opinion.

8    Third, Plaintiff's invalid MMPI test results were noted by Dr. Nicholson and

9    considered to stem from "excessive symptom checking, falsely claiming psychological

10   problems, low reading level, plea for help or confused state." (311) Dr. Nicholson suggested

11   that the conclusion of the excessive symptom scoring with an exaggerated manner follows

12   the impressions gleaned from his psychological clinical interview.  (311) Despite the ALJ's

13   contention that Dr. Nicholson's findings and conclusions were "based to a significant degree"

14   on the MMPI test results, it is evident from the record that Dr. Nicholson's use of the results

15   was cautious and limited at best.  Upon receiving a second invalid test upon re-evaluation in

16   1999, Dr. Nicholson prudently noted that extreme caution was being used in using the

17   clinical scale interpretation, but was being reported nonetheless because of its high

18   correlative value when compared with the impressions from the clinical interview.  (350)

19   Furthermore, Dr. Nicholson performed additional testing, which supported her overall

20   conclusion and opinion regarding Plaintiff's diagnosis.

21   The ALJ also found that Dr. Nicholson's opinions that Plaintiff would not benefit from

22   psychological intervention but should have "some type of psychiatric help" to be curious and

23   contradictory without further elaboration.  (413) While Plaintiff correctly notes that it was

24   within the ALJ's authority and responsibility to request elaboration, she did not do so.  The

25   ALJ errs by rejecting an opinion she is curious and confused about without attempting to

26   clarify that opinion from the source.  This Court assumes the comment was intended to

27   convey the opinion that cognitive-behavioral or psychotherapeutic treatment would be

28   insufficient to address Plaintiff's psychological symptoms; rather, Dr. Nicholson concluded

1   that pharmacologic treatment was necessary.  This assumption is supported by Mr. Wesley's

2   report (509), but, again, could have been clarified by Dr. Nicholson.

3          Finally, although the ALJ also rejected Dr. Nicholson's opinion because she believed

4   the GAF rating of 31 was contrary to the evidence of record, the ALJ failed to note those

5   instances in the record, when they occurred in relation to Dr. Nicholson's opinion, and other

6   instances in the record that support Dr. Nicholson's rating.

7          The ALJ rejected Dr. Rau's opinion because it was simply "not consistent with either

8   the claimant's demonstrated ability to control his impulsivity and irritability or the reported

9   level of social activities."  (414) Contrary to the ALJ's assertion that Plaintiff demonstrated

10  an ability to control his impulsivity and irritability, the ALJ herself expressed her

11  dissatisfaction with his capabilities, asking him when he became frustrated during the

12  hearing: "Have you considered that maybe you're the problem, sir?"  (448)

13         Finally, the ALJ failed to address at all the opinions of Drs. Geffen and Chang, and

14  thus erred by implicitly rejecting them with no "specific and legitimate" reasons for doing

15  so.

16         The Magistrate Judge finds that the ALJ erred by failing to provide specific and

17  legitimate reasons for rejecting the opinions of Drs. Nicholson, Rau, Geffen, and Chang.

18  **2.     Did the ALJ err in relying on vocational testimony from a prior hearing to**

19          **conclude that Plaintiff could perform other work?**

20         At step five in the analysis discussed above, the Commissioner may carry her burden

21  of showing that a claimant is capable of performing other work by eliciting the testimony of

22  a vocational expert in response to a hypothetical that sets out all the limitations and

23  restrictions of the claimant.  *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).

24  Although the hypothetical may be based on evidence which is disputed, the assumptions in

25  the hypothetical must be supported by the record.  *Id.*   If the hypothetical does not reflect all

26  the claimant's limitations, the expert's testimony has no evidentiary value to support a finding

27  that the claimant can perform jobs in the national economy.  *DeLorme v. Sullivan*, 924 F.2d

28  841 (9th Cir. 1991) (citing *Embrey v. Bowen*, 849 F.2d 418, 423 (9th Cir.1988); *Gallant v.*

1    *Heckler*, 753 F.2d 1450, 1457 (9th Cir.1984).  As this Court has previously found, the ALJ's

2    assessment of the Plaintiff was not supported by the record.

3          The hypothetical posed to the vocational expert during the March 1999 hearing did

4    not include any mental health impairments.  (64) When asked by Plaintiff's counsel to

5    consider if there would be a limitation in Plaintiff's ability to be a security guard if he had

6    severe depression and thought of killing himself, the vocational expert replied:  "Definitely.

7    Yes." (67) The vocational expert also stated that if Plaintiff has suicidal ideation, she would

8    not put anyone in the position of parking lot attendant. (68) Also, given Plaintiff's statements

9    about his relationships with people and how he feels about them, she agreed that she would

10   advise against a position as parking lot attendant, a position that has to deal with the public.

11   (68-69)

12         Furthermore, even if the ALJ's findings are adopted by the District Court and the

13   psychological findings of Drs. Nicholson, Rau, Geffen and Chang are rejected, the ALJ still

14   imposed the additional limitation that Plaintiff would work best in an environment with

15   superficial, brief contact with the public, and this limitation was not presented in a

16   hypothetical to the vocational expert.  (414) As noted by the Plaintiff and attached in the

17   Appendix to Plaintiff's motion, both jobs of Security Guard and Parking Lot Attendant

18   indicate a worker function of "significant" serving and dealing with people in the Dictionary

19   of Occupations Titles.

20         When the hypothetical fails to set forth all of a claimant's impairments, the vocational

21   expert's testimony cannot constitute substantial evidence to support the ALJ's findings.

22   *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984).

23         Accordingly, the Magistrate Judge finds that the ALJ erred in relying on the

24   vocational testimony from the March 1999 hearing to conclude that Plaintiff could perform

25   other work in the national economy, because the hypothetical posed to the vocational expert

26   failed to include the Plaintiff's full range of psychological limitations.

27

28

**3.      Did the ALJ err in making an alternative finding that Plaintiff was not disabled based upon the Medical-Vocational Guidelines ("Grid")?**

The ALJ may apply the Commissioner's Medical Vocational Guidelines (the grids) in lieu of taking the testimony of a vocational expert only when the grids accurately and completely describe the claimant's abilities and limitations. *Jones v. Heckler*, 760 F.2d 993, 998 (9th Cir. 1985) (citations omitted).

The fact that a non-exertional limitation is alleged does not automatically preclude application of the grids. *Desrosiers v. Secretary of Health and Human Services*, 846 F.2d 573, 577 (9th Cir. 1988) (citations omitted).  The ALJ should first determine if a claimant's non-exertional limitations significantly limit the range of work permitted by the claimant's exertional limitations. *Tackett v. Apfel*, 180 F.3d 1094, 1102 (9th Cir. 1999).

Although the ALJ considered, in a procedurally appropriate manner, whether or not the Plaintiff's capacity for the full range of light work was significantly compromised by his non-exertional limitations, as noted above, this Court finds that the ALJ's assessment of the severity of Plaintiff's non-exertional limitations was in error.  The evidence in this case demonstrates a severe non-exertional mental impairment, and, accordingly, the application of the grids would be inappropriate in this case.

**4.      Recommendation - Remedy**

Under *Harman, supra,* after finding that the ALJ has failed to provide legally sufficient reasons for rejecting the evidence of Drs. Nicholson, Rau, Geffen and Chang, the court must consider: (1) if there are any outstanding issues that must be resolved before a determination of disability can be made, and (2) if it is clear from the record that the  ALJ would be required to find the claimant disabled were such evidence credited.

This Court finds that there are no outstanding issues remaining.  Considering the improperly discredited evidence in this case demonstrates, overwhelmingly and without contrary opinion, that Plaintiff is disabled.  Furthermore, no purpose would be served by remanding this case for further vocational testimony, as the vocational expert has already

expressed an opinion, that, given Plaintiff's mental health impairments, he would not be suited for either position that the vocational expert proffered at the March 1999 hearing.

Finally, Plaintiff has endured three administrative hearings and a lengthy and fault filled administrative process spanning nearly a decade.  As the Ninth Circuit has noted, "applicants for disability benefits often suffer from painful and debilitating conditions, as well as severe economic hardship. Delaying the payment of benefits by requiring multiple administrative proceedings that are duplicative and unnecessary only serves to cause the applicant further damage-financial, medical, and emotional. Such damage can never be remedied." *Varney v. Secretary of Health and Human Services*, 859 F.2d 1396, 1399 (9th Cir. 1988).

A remand for an immediate award of benefits in this case is the appropriate and just resolution of this case.

**V.    CONCLUSION**

For the foregoing reasons, this Court recommends that the District Judge, after its independent review, GRANT Plaintiff's Motion for Summary Judgment (Document  #7), DENY the  Defendant's Defendant's Cross-Motion  (Document #15), and remand the case for an immediate award of benefits.

Pursuant to Title 28 U.S.C. § 636(b), any party may serve and file written objections within 10 days of being served with a copy of this Report and Recommendation.  If objections are not timely filed, they may be deemed waived.  If objections are filed, the parties should use the following case number: CIV 05-398-TUC-CKJ.

DATED this 25th day of August, 2006.


_____
Bernardo P. Velasco
United States Magistrate Judge